**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ASHLEY B. BENNETT, | : | Civil Action No. 20-cv-05841-AB |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| NORTH PENN SCHOOL DISTRICT | : | Jury Trial Demanded |
| BOARD OF SCHOOL DIRECTORS, et al., | : | |
| Defendants, | : | |

MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UNDER
FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)

I.    Introduction

In an extraordinarily long and bombastic Complaint, set forth in an odd, pseudo-Colonial typeface, Plaintiff Ashley Bennett ("Bennett") has asserted three counts under 42 U.S.C. § 1983. The first two counts allege violation of her rights under the First Amendment of the United States Constitution. The third alleges the violation of her right to procedural due process.

Bennett has sued the North Penn School District, for which she worked as a Supervisor of Special Education, Compl. ¶ 1, until her resignation. She has also named as Defendants Superintendent Dr. Curtis R. Dietrich, Director of Human Resources Dr. J. Mia Kim, Interim Director of Special Education Dr. Michael Sean Arney, Director of School and Community Engagement Christine Liberaski, the North Penn School District Board of Directors, and every member of the Board of Directors. Bennett has named each of the foregoing persons in both their official and individual capacities.

None of the Defendants is properly sued in his or her individual capacity. Each of them is protected by the doctrine of qualified immunity, which shields every public official "but the plainly incompetent or those who knowingly violate the law." Berg v. County of Allegheny, 219 F.3d 261, 272 (3d Cir. 2000).

Accordingly, Defendants Dr. Dietrich, Dr. Kim, Dr. Arney, Ms. Liberaski, and all the individual members of the North Penn School District Board of Directors, *i.e.*, Martina Stoll, Christian D. Fusco, Elisha K. Gee, Jonathan M. Kassa, Wanda Lewis-Campbell, Timothy MacBain, Juliane D. Ramić, Alfred R. Roesch, III, and Catherine A. Wesley, respectfully ask that this Court dismiss them as defendants in their individual capacities.

II.    <u>Factual Background</u>

On the night of June 24, 2020, Bennett reposted on her Facebook page the following:

I'm confused right now.

I see signs all over saying #BlackLivesMatter.  I'm just trying to figure out WHICH black lives matter.

It can't be the unborn black babies – they are destroyed without a second thought.

It's not black cops – they don't seem to matter at all.

It's not my black #Conservative friends.  They are told to shut the f*ck up if they know what's best for them by their black counterparts.  It's not black business owners.  Their property, their business and their employees don't mean anything.

So which black lives matter again?!?

I can't keep up.  I can't. I'm exhausted trying to figure out what we're all supposed to do, believe, and be offended by, and outraged by next.

…

Just 45 days ago protests weren't "essential" and were considered criminal, selfish, and a murderous activity because of the #Coronavirus.  Today they are gloriously critical and celebrated.  All of the obvious criminal and murderous activities are simply ignored.

If you protest about lock-downs for freedom, you are selfish and you will spread a virus.

If you protest, loot, and riot for social justice, you are a warrior and immune from the virus.

…

2

Then came social justice, and social distancing was suddenly no more. #Democrat governors and mayors marched arm-in-arm with protesters. A thousand people at three memorials for someone they never even met.

It's a matter of "respect." But you couldn't have a funeral for a family member.

Black Lives Matter. Of course they do. But then multiple black police officers and individuals were killed during the "peaceful protests". I don't see any outrage.

Black individually owned businesses were burned to the ground. Silence.

Deadliest weekend in Chicago, virtually all black on black violence. The #MainstreamMedia is silent. NOTHING!!

I'm confused now.

Look at the data. NO, not that data.

Do the math. No, you can't do the math like that.

Only the experts can understand the data and the math.

And Black Lives Matter protesters REFUSE to look at or discuss the #FBI Crime Statistics – because the data doesn't support their claims of systemic racism against blacks.

Just listen to the black community leaders. No, not them, only the radicals are right.

…

Remember. It's an election year and #liberals are desperate, don't put anything past them.

They hate #PresidentTrump more than they love #America and they don't care how much damage they do to our country.

So for now I pray.

I pray God will heal our land and Bless the United States of America.

Compl. ¶ 20.

Thus, Bennett endorsed the view that systemic racism does not exist. She invoked

"destroyed black babies," "looting and rioting for social justice" and "black on black crime."

She adopted the opinion that the Black Lives Matter movement is *not* truly concerned with the sometimes-fatal encounters between the police and U.S. citizens of African descent, but – rather – that it is just a technique to spite the sitting President.

Unsurprisingly, Bennett's Facebook post was the cause of considerable disruption in the diverse North Penn community, where the post was widely viewed as racist.  Compl. ¶ 23.  This distress was communicated directly to the North Penn School District, and some individual Defendants.  Compl. ¶ 23.  The community reaction was strong enough that articles appeared in the independent media.  Compl. ¶ 34.

In response to the expressions of community concern and anger directed toward it, the North Penn School District placed Bennett on administrative leave on June 25, 2020, with full pay and benefits, pending an investigation.  Compl. ¶ 26.  The North Penn School District also posted a statement on its website.  Compl. ¶ 32.  The statement said that the Facebook comments brought to its attention did not align with the North Penn School District's core values.  Id.  It affirmed the North Penn School District's commitment to "acknowledge, respect, understand, and celebrate the dynamics of racial and cultural differences."  Id.

On June 29, June 30, and July 1, 2020, Bennett met with North Penn School District's Director of Human Resources, Dr. Kim, for informal discussions regarding how Bennett would proceed.  Compl. ¶ 52.  During those meetings, they discussed the possibility of Bennett's resignation, as well as the possibility that she would "fight for her job" and appear at a due process hearing where she would have the opportunity to hear the charges against her, and to respond, as required by Cleveland Board of Education v. Loudermill, 40 U.S. 532 (1985).  Compl. ¶¶ 59-60.

The North Penn School District provided Bennett with paperwork to implement a resignation.  Compl. ¶ 99.  On July 9, 2020, Bennett wrote a letter, with the salutation:  "Dear

North Penn."  Id.  In it, she indicated that she would not sign the resignation paperwork.  Id.  Dr.
Kim emailed Bennett the same day, asking whether her letter constituted a resignation, and
notifying her that – if not – a Loudermill hearing would be held on Monday morning, July 13,
2020.  Compl. ¶ 101.

On the morning of Friday, July 10, 2020, Bennett emailed Dr. Kim a response letter.
Compl. ¶ 107.  Despite having just been advised of the date of her Loudermill hearing, she
wrote:  "You forced me to resign."  Id.  Apparently, Bennett had decided that it would be
advantageous if she were to be constructively discharged.

On Sunday, July 12, 2020, Dr. Kim replied to Bennett.  Compl. ¶109.  In her letter, Dr.
Kim clarified that: (a) she had no power to "force" Bennett to resign, although she advised her to
do so; (b) Bennett had not been terminated; (c) no disciplinary action had yet been taken against
her; and that (d) if Bennett did not wish to resign, she should attend her Loudermill hearing the
next morning.  Id.  Nevertheless, the attorney who now represents Bennett emailed Dr. Kim at
ten that night, stating, among other things:  "You forced her to resign."  Compl. ¶ 112.

Bennett did not attend the July 13, 2020, Loudermill hearing.  Compl. ¶ 113.  Dr. Kim
then wrote to Bennett, forwarding the prior night's email from counsel, and stating, in part:

> Last night I received the below communication from an individual stating that he
> is your attorney.  This is a different individual than your attorney with whom we
> had been in communication last week.  In his message, he states that you were
> "forced" to resign and that you are no longer an employee of the District.  *As I
> explained to you in my email yesterday afternoon, I have no ability to force you to
> resign*. … I have also explained to you that your status with the District is that
> you are on administrative leave with full pay and benefits. … Because you may
> be receiving conflicting information from an attorney with whom you are
> apparently consulting, I am willing to reschedule our meeting for tomorrow,
> Tuesday, July 14, 2020, at 8:30 a.m..

Id.  (italics and underlining in original).

In response, Dr. Kim received another communication from Bennett's new attorney, who
– despite Dr. Kim's explanation of Bennett's employment status, and despite the Loudermill

hearing scheduled for the next morning – repeated that Bennett had been "forced to resign." Compl. ¶1 21.

On the morning of July 14, 2020, Bennett failed to attend the second scheduled Loudermill hearing.  <u>Id</u>.  Dr. Kim therefore wrote to Bennett informing her that, in light of her failure to attend two hearings, and in light of the communication from Bennett's new counsel, she would be understood to have expressed a wish to resign.  <u>Id</u>.  Bennett did not respond to this, or dispute this characterization of her wishes.  On July 17, 2020, therefore, Dr. Kim emailed Bennett again, informing her that the Board of Directors had accepted her resignation at a July 16, 2020, board meeting.  Compl. ¶ 122.  The North Penn School District would pay Bennett through July 14, 2020, the effective date of her resignation.  <u>Id</u>.

The present case was filed in the Court of Common Pleas for Montgomery County on or about October 23, 2010.  Defendants timely removed it to the U.S. District Court for the Eastern District of Pennsylvania, as permitted by 28 U.S.C. § 1441.

III.    <u>Applicable Legal Standards</u>

A.    <u>Federal Rule of Civil Procedure 12(b)(6): Qualified Immunity</u>

Federal Rule of Civil Procedure 12(b)(6) permits a defendant to seek dismissal of a pleading, or part of a pleading, which fails to state a claim upon which relief can be granted. Qualified immunity will be upheld on a 12(b)(6) motion when the immunity is established on the face of the complaint.  <u>Thomas v. Ind. Twp.</u>, 436 F.3d 285, 291 (3d Cir. 2006); <u>Martin-McFarlane v. City of Philadelphia</u>, 299 F. Supp.3d 658, 667 (E.D. Pa. 2017).

B.    <u>Qualified Immunity</u>

A defendant sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.  <u>Plumhoff v. Rickard</u>, -- U.S. --, 137 S. Ct. 2012, 2023 (2014), <u>citing Ashcroft v. al-Kidd</u>, 563 U.S. 731, 741 (2011); <u>Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist.</u>, 877 F.3d 136, 142-3 (3d Cir. 2017).

Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly, and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.  <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009).  Because qualified immunity results in immunity from suit, it should be determined as early as possible whether officials are entitled to its protection. <u>Thomas v. Ind. Twp.</u>, 463 F.3d at 291; <u>Martin-McFarlane</u>, 299 F.Supp.3d at 667.

Further, to deprive a § 1983 defendant of qualified immunity, the federal right alleged to have been violated must have been clearly established, not merely as a broad general proposition, but in light of the specific context of the case.  <u>Mullenix v. Luna</u>, 577 U.S. 7, 11-12 (2015).  The Supreme Court has "repeatedly stressed" that courts must not define clearly established law at a high level of generality, since doing so avoids the "crucial question" whether the official acted

reasonably in the particular circumstances that he or she faced.  D.C. v. Wesby, -- U.S. -- , 138 S. Ct. 577, 590 (2018); Saucier v. Katz, 533 U.S. 194, 202 (2001).  A rule is too general if the unlawfulness of the conduct "does not follow immediately from the conclusion that [the rule] was firmly established."  Wesby, supra.

Thus, qualified immunity provides government officials with "leeway in applying difficult or murky law."  Carlino v. Gloucester High Sch., 57 F. Supp.2d 1, 33-34 (D.N.J. 1999), aff'd in part, 44 F. App'x 599 (3d Cir. 2002), citing Anderson v. Creighton, 483 U.S. 635, 640 (1987).

Further, the Court of Appeals for the Third Circuit has written:

In conducting the inquiry into whether a right is clearly established, we look first for "applicable Supreme Court precedent."  Mammaro v. N.J. Div. of Child Prot. & Permanency, 814 F.3 164, 169 (3d Cir.), as amended (Mar. 21, 2016).  If none exists, we consider whether there is a case of controlling authority in our jurisdiction or a "'robust consensus of cases of persuasive authority' in the Courts of Appeals [that] could clearly establish a right for purposes of qualified immunity."  See id. (quoting Taylor v. Barkes, -- U.S. --, 135 S.Ct. 2042, 244, 192 L.Ed.2d 78 (2015) (per curiam))).

Barna, 877 F.3d at 142-43.  The authority need not be directly on point, "but existing precedent must have placed the statutory or constitutional question beyond debate."  Id., quoting al-Kidd, 563 U.S. at 741.

C.    <u>Qualified Immunity As To First Amendment Law Regarding School Employees</u>

In her Complaint, Bennett relies almost exclusively on <u>Pickering v. Bd. of Education of Twp. High Sch. Dist. 205, Will Cty. Illinois</u>, 391 U.S. 563 (1968) and <u>Garcetti v. Ceballos</u>, 574 U.S. 410 (2002). Indeed, these cases set forth, at a high level of generality, the First Amendment law regarding statements on matters of public concern made by a school employee in her private capacity. Together, they establish that the First Amendment compels a balance between the rights of the employee, as a citizen, and the interest of the school district in promoting the efficiency and effectiveness of the public services it performs. <u>Pickering</u>, 391 U.S. at 568; <u>Garcetti</u>, 574 U.S. at 416-18.

The Supreme Court has recognized that the test established by <u>Pickering</u> and <u>Garcetti</u> "is difficult, [and] the courts must reach the most appropriate balancing of the competing interests." <u>Connick v. Meyers</u>, 461 U.S. 138, 150 (1983). This balancing test is highly fact sensitive and "depends upon the nature of the employee's specific expression." <u>Id</u>. As a result, the employee's statement "will not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." <u>Rankin v. McPherson</u>, 483 U.S. 378, 388 (1987), <u>citing</u> <u>Connick</u>, 461 U.S. at 152-53, and <u>Givhan v. Western Line Cons'd Sch. Dist.</u>, 439 U.S. 410, 415 n. 4 (1979).

D.    <u>Black Lives Matter</u>

The Black Lives Matter movement is a fairly new societal phenomenon, and there is no applicable Supreme Court First Amendment precedent which concerns it, nor is there a "'robust consensus of cases of persuasive authority' in the Courts of Appeals," which would place the question as to how the <u>Pickering</u> balancing test applies here "beyond debate." <u>al-Kidd</u>, 563 U.S. at 741.

What authority exists, however, indicates that a school district's right to teach students with efficiency and effectiveness outweighs an employee's right to make a public statement dismissing Black Lives Matter in racially problematic terms.  In Atwater v. Tucker, 807 S.E.2d 56 (Ga. App. 2017), cert. denied 303 Ga. 791 (June 4, 2018), cert. denied 139 S. Ct. 459 (Nov. 2018), a teacher brought a § 1983 action against the superintendent of the school district where she was employed, as well as the chairperson of the board of education.  She alleged that her First Amendment right to free speech was violated when she was disciplined for a social media post.

Kelly Tucker, the teacher had made a public comment in a conversation on a radio show's Facebook page regarding a local Christmas parade at which some demonstrators carried Black Lives Matter signs to protest the death of Michael Brown in Ferguson, Missouri.  Id., 807 S.E.2d at 58-59.  She wrote:

> If the dude hadn't have stolen, he would be alive.  I think the signs should read, TAKE THE HOOD OFF YOUR HEAD, AND PULL UP YOUR DANG PANTS, AND QUIT IMPREGNATING EVERYBODY.  I'm tired of paying for these sorry *&^ thugs.

Id. at 59.  Her post "went viral."  Id.  A number of people contacted school district Superintendent Atwater, including parents of students in Tucker's class, and several teachers and administrators at the school where she taught.  Id.  Tucker was disciplined by the school district, though not dismissed.  Id. at 60.

The Georgia Court of Appeals reversed the District Court's denial of the defendants' motion for judgment on the pleadings.  It held that the defendants were entitled to qualified immunity, citing United States Supreme Court cases.  Id. at 61-62.  The court determined that the Pickering test weighed in favor of the school's right to discipline the teacher, because where "close working relationships are essential to fulfilling public responsibilities, a wide degree of deference [is given] to the employer's judgment[.]"  Id., citing Connick, 461 U.S. at 151-52.  It

went on to hold that the defendants were also entitled to judgment in their favors in their official capacities, and reversed the judgment of the lower court in its entirety.  Id. at 63.

Although the decisions of the Georgia Court of Appeals are not precedential here, it should be noted that the United States Supreme Court denied Tucker's petition for certiorari. 139 S. Ct. 459 (Nov. 2018).

In a federal case, a police department's interest in maintaining public trust was found to outweigh the First Amendment right of police officers to post Facebook comments referring to members of Black Lives Matter as "ghetto trash race baiting scumbags."  Sabatini v. Las Vegas Metro Police Dept., 369 F. Supp.3d 1066, 1071 (D. Nev. 2019), recon. denied Civ. A. No. 217-01012JADNJK, 2019 WL 3307040 (D. Nev. July 23, 2019).  Even though only one community member contacted the police department, the court upheld the department's decision to fire the officers, citing Pickering and Connick.  Id. at 1085-86.

IV.    Argument

A.    All Individual Defendants Are Entitled to the Protection of Qualified Immunity

As the above discussion of the relevant law shows, all the defendants named in their individual capacities are properly dismissed, because they have a right to the protection of qualified immunity.  None of them violated a right that was clearly established at the time their conduct took place.  This is the only way a public official can be deprived of qualified immunity. Plumhoff, 137 S. Ct. at, citing al-Kidd, 563 U.S. at 741; Barna, 877 F.3d at 142-43.

On the contrary, the controlling law sets forth a highly fact-specific balancing test. Rankin, 483 U.S. at 388, citing Connick, 461 U.S. at 152-53, and Givhan, 439 U.S. at 415 n. 4. There certainly is no controlling precedent clearly establishing that Bennett's right to post a racially offensive statement about Black Lives Matter on social media outweighed the North Penn School District's right to address the resulting disruption to its goal of promoting the efficiency and effectiveness of its schools. Pickering, 391 U.S. at 568. It is impossible to conclude that the balancing test established in Pickering and Garcetti makes the unlawfulness of the defendants' conduct "follow immediately." Wesby, 138 S. Ct. at 590.

Clearly, Pickering and Garcetti set forth the law regarding a public employee's First Amendment rights at too high a level of generality to preclude the application of qualified immunity. Wesby, 138 S. Ct. at 590; Saucier, 533 U.S. at 202.

At a level of greater specificity, what relevant law there is suggests that Bennett's First Amendment rights were not violated. See Atwater, supra, and Sabatini, supra, citing the Supreme Court's decisions in Pickering, Garcetti, and Connick. Similarly, Bennett will have an uphill battle trying to show her due process rights were violated when it was she who failed to appear at two sequentially scheduled Loudermill hearings. Ultimately, this and other law will doom Bennett's action. For now, however, it is sufficient to recognize that all named individual defendants could very reasonably have believed that the First Amendment permitted him or her to take every action that Bennett specified was taken in response to her racially offensive Facebook post.

Further, doubt exists as to what "actions" are supposed to have violated Bennett's rights. The facts, as set forth in Bennett's Complaint, show that the North Penn School District got no further than scheduling a Loudermill hearing before Bennett decided to self-constructively discharge. Unlike the Atwater and Sabatini defendants, Bennett was never disciplined for her

offensive social media post.  As to due process, the letters quoted by Bennett in the Complaint establish that she was provided with the opportunity to hear, and respond to, any charges against her.

Bennett cites Smith v. Dunmore, 633 F.3d 176, 180 (3d Cir. 2011), for the proposition that a suspension pending an investigation can constitute a First Amendment violation.  Compl. ¶ 184.  She appears unaware of the ultimate outcome in that aspect of the case.  In a later trip to the Third Circuit, 516 Fed. App'x. 194 (3d Cir. 2013), the Court of Appeals ruled that Smith's eight-day paid suspension followed by a full hearing was such a small deprivation that it was "incidental at best," and justified by both the governmental interest in public safety and its interest in "avoiding negative press."  Id. at 200.  Bennett, too, would have had a full hearing following her paid suspension, if she had shown up either the first or the second time that it was scheduled.

Even if some merit were found in one of Bennett's claims (which seems unlikely), the individuals are still clearly entitled to qualified immunity:  "The qualified immunity doctrine gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law."  Berg, 219 F.3d at 272.  This is how the Supreme Court has chosen to shield officials from harassment, distraction, and liability when they perform their duties reasonably.  Pearson, 555 U.S. at 231.

B.     Defendants Stoll, Fusco, Gee, Kassa, Lewis-Campbell, MacBain, Ramić, Roesch and Wesley Must Be Dismissed in their Individual Capacities As They Are Not Alleged to Have Taken Any Specific Acts

A state official is protected by qualified immunity except where the plaintiff has alleged facts sufficient to show that the official took specific acts in violation of her civil rights.  al-Kidd, 563 U.S. at 735; Hyman v. Capital One Auto Fin., 826 F. App'x 244 (3d Cir. 2020).  A defendant in a civil rights action must, in any case, have personal involvement in the alleged

wrongs.  Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988), citing Parratt v. Taylor, 451 U.S. 527, 537 n.3 (1981).  Allegations of participation or actual knowledge and acquiescence must be made with appropriate particularity.  Rode, supra.  There is no *respondeat superior* liability in a § 1983 case.  Id.

Without conceding that any defendant in this matter is properly sued in his or her individual capacity, it is particularly clear that the individual members of the North Penn School District Board of Directors, *i.e.*, Martina Stoll, Christian D. Fusco, Elisha K. Gee, Jonathan M. Kassa, Wanda Lewis-Campbell, Timothy MacBain, Juliane D. Ramić, Alfred R. Roesch, III, and Catherine A. Wesley, must be dismissed because they are not even alleged to have taken any specific action.  Their names appear nowhere in the Complaint other than where they are identified as defendants.

Where each individual Director is named, Bennett repeats, as a boilerplate nod to the controlling law, that the Director "directly participated, supervised, and acquiesced" in the deeds alleged to have been wrought upon Bennett.  Compl. ¶¶ 142-50.  Yet, Rode's "appropriate particularity" is lacking.  None of the Directors is mentioned in the Complaint as having done a single thing.

The North Penn School District Board of Directors as a whole is scarcely alleged to have taken any action.  At most, the Board of Directors ratified Bennett's resignation on July 16, 2020.  It is impossible to portray this as a knowing violation of clearly established law by any individual director.  No director is specifically alleged to have said anything or done anything.  Bennett has not even attempted to cite law establishing that a school board's ratification of an employee's resignation is a violation of her First Amendment Rights.  Further, where, as here, the resignation was presented to the Board of Directors only after two Loudermill hearings, it is not realistic to state that Bennett's right to procedural due process was violated.

Again, this will inevitably lead to the failure of Bennett's case.  However, it is sufficient for now to point out that each one of the defendants is entitled to qualified immunity.  Bennett has not alleged any facts which demonstrate that Martina Stoll, Christian D. Fusco, Elisha K. Gee, Jonathan M. Kassa, Wanda Lewis-Campbell, Timothy MacBain, Juliane D. Ramić, Alfred R. Roesch, III, or Catherine A. Wesley, took any action whatsoever with respect to the events of June 24-July 16, 2020.

V.      Conclusion

In accordance with the foregoing, Defendants J. Mia Kim, Dr. Michael Sean Arney, School Superintendent Curtis R. Dietrich, Christine Liberaski, Martina Stoll, Christian D. Fusco, Elisha K. Gee, Jonathan M. Kassa, Wanda Lewis-Campbell, Timothy MacBain, Juliane D. Ramić, Alfred R. Roesch, III, and Catherine A. Wesley, respectfully request that the claims against them in their individual capacities be dismissed for failure to state a claim upon which relief can be granted, under Federal Rule of Civil Procedure 12(b)(6).

Respectfully Submitted,

SWEET, STEVENS, KATZ & WILLIAMS LLP

Date: November 24, 2020               By: /s/Karl A. Romberger, Jr.
                                          Karl A. Romberger, Jr., Esquire, PA60636
                                          Justin D. Barbetta, Esquire, PA318221
                                          331 Butler Avenue, Post Office Box 5069
                                          New Britain, Pennsylvania  18901
                                          t (215) 345-9111
                                          kromberger@sweetstevens.com
                                          jbarbetta@sweetstevens.com
                                          Attorneys for Defendants

15

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ASHLEY B. BENNETT, | : | Civil Action No. 20-cv-05841-AB |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| NORTH PENN SCHOOL DISTRICT | : | Jury Trial Demanded |
| BOARD OF SCHOOL DIRECTORS, et al., | : | |
| Defendants, | : | |

**<u>CERTIFICATE OF SERVICE</u>**

I, Karl A. Romberger, Jr., attorney for Defendants, certify that a true and correct copy of Defendants' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UNDER FED. R. CIV. PROCEDURE 12(b)(6) AND MEMORANDUM OF LAW IN SUPPORT were served on this date on the following by electronic mail to:

Francis Malofiy, Esquire
Alfred Fluehr, Esquire
280 North Providence Road Suite 1
Media, Pennsylvania  19063
francis@francisalexander.com

*Attorneys for Plaintiff*

SWEET, STEVENS, KATZ & WILLIAMS LLP


Date: <u>November 24, 2020</u>          By: <u>/s/Karl A. Romberger, Jr.          </u>
                                        Karl A. Romberger, Jr., Esquire, PA60636
                                        Justin D. Barbetta, Esquire, PA318221
                                        331 Butler Avenue, Post Office Box 5069
                                        New Britain, Pennsylvania  18901
                                        *t* (215) 345-9111
                                        *kromberger@sweetstevens.com*
                                        *jbarbetta@sweetstevens.com*
                                        Attorneys for Defendants