| | |
|---|---|
| Ashely B. Bennett<br>*Plaintiff*<br><br>v.<br><br>North Penn School District, *et al.*;<br>*Defendants* | No.: 20-05841-AB<br><br><br><br><br>*Jury Trial Demanded*<br><br>**Oral Argument Demanded** |

## Plaintiff's Response in Opposition to Individual Defendants' Motion to Dismiss

## I. Introduction

Plaintiff Ashley Bennett—a 27 year educator with a perfect record—filed a Complaint alleging First and Fourteenth Amendment Constitutional violations against the defendant entities North Penn School District and the Board of Directors, as well as claims against 13 administrators and board members in their official and individual capacities, for retaliating against her based on the political viewpoints she expressed in a personal, out-of-school Facebook post.

Bennett had posted on her private Facebook profile a message of support for Black conservatives, that also expressed right-of-center political opinions and criticized the left-wing ideology of the controversial Black Lives Matter group.

The Complaint explains that Defendants—almost all left-wing Democrats—admitted in a public press release to disciplining Bennett, and later forcing her to resign, because they opposed the content of her opinions:

> The comments *do not align* with the North Penn School District's core values. *The views expressed conflict with our work to develop a community*

> *that values diversity*. We strive to acknowledge, respect, understand, and celebrate the dynamics of racial and cultural differences. …
>
> The employee has been placed on administrative leave while an investigation is conducted

Exhibit 1 - North Penn Website Press Release (emphasis added).[1] The given reason for the discipline—that government officials disagreed with the content of Bennett's out-of-school political speech—*is flatly illegal and unconstitutional*. In the press release, Defendants even endorsed Black Lives Matter and its values "100%," making it unambiguous that they were engaging in viewpoint discrimination. Similar comments were made by Defendants to news outlets.

Never once in this entire fiasco have Defendants been able to identify a single policy or regulation she violated before they disciplined her, told her she was being terminated, and forced her to resign (all without any due process); her transgression was to privately hold political opinions Defendants disagreed with.[2]

Despite the lack of cause, following the public attacks Defendants proceeded to interrogate Mrs. Bennett for days about her thoughts, beliefs, and ideas with the goal and purpose of forcing her to resign. Defendants were not subtle about this goal, with the Director of HR Mia Kim stating that if Bennett did not resign the district would terminate her and ruin her career:

> Kim: You have come in fighting for your job. If you were my sister would be "Listen, *are you planning on working years down the road*, if that is the case, A, you want your job, but the big picture is where do you, *this is going to get ugly, have you thought about the consequences about future employment?* When you have the hearing, you can have a closed hearing, but that information will

---

[1] All exhibits referenced were attached the Complaint.

[2] Defendants' brief quixotically attacks Plaintiff for using a "colonial" font in the complaint. This claim is baseless and they are simply alerting the reader to their own biases. The font is Equity Text, designed for legal writing by an attorney. It is a *slight Times New Roman variation* meant to be easier to read. See Matthew Butterick, "Typography for Lawyers," https://typographyforlawyers.com/.

Defendants evidently negatively view the First Amendment as a dated and unnecessary "colonial" relic they do not have to follow, and prefer that they be able to censor their political opponents without limitation or oversight.

become public. You can also have an attorney with you. I am not judging you as a person, ***what is your plan, do you want to be employed? If the answer is yes, think about the consequences.*** If you want to go to the board, you will have a Loudermllk [sic] hearing. Any information is going to find out about that.

Bennett: it's already out there, so how much more public could it be?

Kim: ***it's different to be terminated then quitting. If you are terminated, no one will look at your resume, it speaks volumes.***

<u>See</u> Exhibit 6 (emphasis added). When Bennett asked if there was no other option, and for a "second chance," she was told that she was being terminated. <u>Id.</u> Note how her termination was already decided before any <u>Loudermill</u> hearing was even offered to her, which is completely backwards.

Defendants—all governmental bodies and officials who are constitutionally bound not to discriminate based on political viewpoints—plainly view it as their place and right to enforce ideological conformity with their left-wing political opinions to the exclusion of opposing points of view, even where the employee expressed her opinion privately and out-of-school. This type of retaliation and discrimination is illegal and unconstitutional, and has been for a very long time. Rarely do tortfeasors so brazenly and self-righteously announce their illegal conduct to the world.

The individual defendants have now moved to partially dismiss the claims brought against them in their individual capacities. The two bases for their motion are the assertions that:

1. They are all entitled to qualified immunity on the First Amendment free speech claim as they do not think the rights they violated were clearly established

2. The Complaint lacks specificity as to the Board Members

The motion should be denied as legally and factually deficient.

Regarding qualified immunity for the First Amendment claims, the Complaint details that Defendants knew or should have known that they had no right to police Plaintiff's out-of-school,

private political speech, much less punish her based on their disagreement with the viewpoints she expressed. It details that these legal precepts have been established by the Supreme Court for decades. Defendants baselessly assert that the post was "racially offensive" and that gives them cover to punish her; yet, setting aside that her post is not remotely "racist" and this assertion is defamatory, the fact that Defendants are pejoratively characterizing her expression demonstrates that they are engaged in viewpoint and content-based discrimination. The First Amendment exists precisely to protect allegedly controversial speech on allegedly controversial issues. The First Amendment prohibits Defendants from conducting ideological inquisitions to enforce conformance with their desired political hegemony. If Defendants were permitted to punish any speech they subjectively labeled controversial, then any speech could be deemed offensive and illegal at a moment's notice, and the First Amendment would be a dead letter.

Restated, Bennett does not have to justify her political beliefs and opinions to anyone, especially Defendants.

Defendants also try to claim they have qualified immunity because they say her post allegedly caused disruption. There are several problems with this spurious assertion. **First**, this was **_not_** the contemporaneous reason given for the discipline of Plaintiff. Instead, Defendants publicly stated that she was being disciplined because she had contradicted Defendants' preferred political values and opinions. **Second**, an illegal reason (viewpoint discrimination) was a "substantial motivating factor" for the adverse action, even if disruption was also present. Defendants' press release establishes this by itself. **Third**, Defendants have presented no evidence of actual disruption whatsoever, other than that Bennett's political opponents were targeting her.

That Defendants retaliated against Bennett because it agreed with her political opponents is further proof of illegal motives and pretext, and does not establish disruption.

The pled facts must be admitted as true, and viewed in the most favorable light to Plaintiff. At the motion to dismiss phase, there is simply no basis on which to dismiss any individual defendant based on qualified immunity.

Regarding whether the claims are properly pled against the individual board members, they are indeed well pled. The Complaint pleads that the Board Members were well aware of the very public illegal actions being taken against Bennett by the District, and at all points ratified that conduct through their inaction. Defendant Kim also referenced the Board as being aware of what was happening, and stating that Bennett did not want to go before the Board because it had already been decided they would terminate her. Furthermore, the Board Members are not only pled to have ratified the District's illegal conduct and approved her termination, but after Bennett's involuntary resignation on July 9, 2020, they all participated in a fraudulent course of action to have the District hold fake Loudermill hearings after she was no longer employed, and then voted to accept Bennett's "resignation" after the fake Loudermill hearings to make it seem as if she was given due process.

## II. Background Facts

Mrs. Ashley B. Bennett worked for 27 years with special needs children, and was employed for the last 8 years as Supervisor of Special Education for the North Penn School District.

On June 24, 2020, in the middle of the presidential election, she reposted on her private account a Facebook post which commented on the Black Lives Matter movement, riots, and other matters of public concern. Complaint, at ¶19-21; Exhibit 2. The post argued that the Black Lives Matter was a left-wing movement which hypocritically ignored and marginalized black

conservatives, black businesses, black police officers, and black children. Id. School Board policies 320 and 321 specifically guarantee Bennett's rights to participate in politics as a private citizen, as does the First Amendment. Exhibit 3; Exhibit 4.

Left-wing activists saw the post and were offended that Bennett had posted something opposing the BLM movement, and contacted North Penn. Complaint, at ¶22. Instead of the District properly issuing the standard "employees have a First Amendment right to free speech, and their opinions are not that of the District," the leftwing District and its officials instead immediately resolved to terminate Bennett for the content of her political opinions. Less than 24 hours after the post, she was indefinitely suspended without notice on June 25, 2020, with the only reason being given was that her opinions were "racist." Id. at ¶26-28. She was not told what charges there were. This was both a Due Process and First Amendment violation. Smith v. Borough of Dunmore, 633 F. 3d 176, 180 (3d Cir. 2011); Dee v. Dunmore, 549 F.3d 225 (3d Cir. 2008) (placing employee on leave even with pay without notice or hearing is a due process violation). The HR Director, defendant Mia Kim, told her an investigation would happen and that Bennett had to keep everything confidential. Id. This was all terrifying to Bennett who has never had disciplinary problems.

Unbeknownst to Bennett, while Kim was repeatedly reassuring her everything would be kept confidential, the District was drafting a press release and providing comments to news organizations. On June 26, Bennett woke up to a press blitz that destroyed her life and career. The press release, posted on the District's website, endorsed BLM and stated:

> The comments **do not align** with the North Penn School District's core values. **The views expressed conflict with our work to develop a community that values diversity**. We strive to acknowledge, respect, understand, and celebrate the dynamics of racial and cultural differences. ...

> The employee has been placed on administrative leave while an investigation is conducted

Exhibit 1 to Complaint (emphases added); Complaint, at ¶32. This is a straightforward admission of viewpoint retaliation and discrimination in violation of Bennett's First Amendment rights. The District cannot outlaw criticism of BLM, nor prescribe what opinions or values "shall be orthodox in politics." <u>West Virginia State Board of Education v. Barnette</u>, 319 U.S. 624 (1943).

Defendant Kim then interrogated Bennett for 3 days and outrageously made her justify her political opinions to Kim. <u>See</u> Complaint, at ¶48-75. At the end of the three days, Kim revealed that the decision ***had already been made to terminate her***, and she threatened that if Bennett fought this predetermined decision the leftwing Board would smear her and destroy her career. <u>Id.</u> This was done without any <u>Loudermill</u> notice or hearing, ***and in fact Kim egregiously thwarted due process by threatening "I would not bring up Loudermill"***; Defendants wanted Bennett gone by any means necessary. Exhibit 6.

To this day, Defendants have never identified a single law or policy she violated; her prosecution was utterly baseless and without cause. Yet, despite there being no basis to punish her, and no <u>Loudermill</u> notice sent, Bennett was suspended indefinitely and told it had been decided she was being terminated.

Following Defendants' threats, ***Defendants drafted*** a resignation that they wanted Bennett to sign between July 1 and July 9, 2020. On July 9, 2020, recognizing that there was no way for her to return to North Penn given the hostile environment Defendants had created with their public attacks on her, and the fact that she had been told her termination had already been predetermined,

Bennett submitted her own letter stating that she was no longer an employee and that she had been forced out.[3]

It was at that point that North Penn realized they had a serious problem and began to try to cover up what it had done. The HR Director Mia Kim, after receiving Bennett's letter, refused to acknowledge that Bennett was no longer an employee, and then tried to schedule a Loudermill hearing *after Bennett was no longer employed*. Complaint, at ¶93-126. Nothing Kim sent to Bennett identified any charges that were to be the basis of a Loudermill hearing (because there were none).

These facts establish three important points: (1) North Penn suspended Bennett and decided she was being terminated before providing any Loudermill (in fact, raising Loudermill was discouraged), and (2) a notice that does not identify the legal charges the employee is charged with is not a valid Loudermill notice, and (3) an employer cannot retroactively hold a Loudermill hearing after the person is no longer an employee.

Following Bennett's leaving, Bennett asked Kim to stop contacting her repeatedly, and when she would not stop directed Kim to only contact her new counsel. Complaint, at ¶93-126. Defendants then held a fake Loudermill hearings on July 13-14 without Bennett, and then the defendant Board Members voted that Bennett had resigned as of July 14, 2020, to falsely make it appear as if she had been employed when Defendants held their fake Loudermill song and dance. Id.

---

[3] Although constructive termination is not at issue in this motion, Bennett notes that she alleges that this was a constructive termination because: (1) there was no basis to discipline her in the first place, (2) the District had told her the decision to terminate was predetermined and any future hearing was a sham, (3) they had threatened her career if she contested her predetermined termination, and (4) a reasonable person would not return to the hostile environment created by the District. Judge v. Shikellamy School District, 905 F. 3d 122, 123 (3d Cir. 2018) (stating where no cause for the threatened termination "the choice between resignation and the initiation of termination proceedings was 'purely coercive.'").

She is now bringing § 1983 claims for First Amendment Speech and Affiliation Retaliation, and Fourteenth Amendment Due Process Claims.

## III. Legal Standard

The defendants move to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). The moving parties have the burden to show no claim has been stated. Hedges v. United States, 404 F.3d 744, 750 (3d Cir.2005). Dismissal is only allowed if, accepting the pled facts as true and construing all reasonable inferences and disputes in a light most favorable to the plaintiff, the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face," Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). The facts alleged must be sufficient to "raise a right to relief above the speculative level." Twombly, 550 U.S. 544, 127 S.Ct. at 1965.

## IV. Application

The individual defendants have all moved to dismiss the First Amendment free speech retaliation claim based on qualified immunity, and the Board Members have moved to dismiss for lack of specificity. Both arguments should be rejected and the motion denied.

### a. The Qualified Immunity Argument is Baseless and Should be Rejected

The individual defendants are moving to dismiss the First Amendment free speech claim on the basis of qualified immunity. It should be noted that the motion does not analyze qualified immunity as it relates to the First Amendment political association retaliation claim, nor the Fourteenth Amendment Due Process claim.

The qualified immunity argument section in Defendants' motion is only two pages long and is confusing. Defendants first argue that they are entitled to qualified immunity because they

allege disruption occurred, and then because they claim Bennett is a racist.

### i. It Has Long Been Clearly Established that Governmental Employees Have the Right to Speak on Public Matters Outside Their Employment, Regardless of Claims of Disruption

As the Complaint identifies, a governmental official sued for constitutional violations can only claim qualified immunity when the constitutional right in question is not "clearly established" and they do not know their conduct was illegal. Dougherty v. Sch. Dist. of Phila., 772 F.3d 979, 993-94 (3d Cir. 2014). Courts generally look to the Supreme Court and Courts of Appeal as to whether a right is clearly established; however, other authority may be cited as well. Id.

The First Amendment right in question is whether a school administrator has the right to freedom of speech in non-school settings, to express opinions on the political issues of the day, on issues not related to the school district.

The instant question to be answered is if this right was clearly established in June and July 2020. The answer is that it was clearly established. How is this known? Because it is codified by Defendants themselves as "Board Policy 320 Freedom of Speech in Nonschool Settings":

> "The Board acknowledges the right of administrative, professional and support employees as citizens in a democratic society to speak out on issues of public concern."

Exhibit 3 - Board Policy 320. The only restrictions listed are (1) refrain from comments that would interfere with student discipline, (2) refrain from public comments about the district known to be false, and (3) to refrain from threats against District employees. None of these restrictions in the policy remotely apply to this case.

The case law is likewise clear that public employees have a right to speak out on issues of public concern, as explained by the Third Circuit in Dougherty, 772 F.3d at 993-94:

> "Since at least 1967, "it has been settled that a State cannot condition

> public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." <u>Connick</u>, 461 U.S. at 142, 103 S.Ct. 1684 ; <u>see also</u> <u>Rankin</u>, 483 U.S. at 383, 107 S.Ct. 2891 (finding the same principle "clearly established"). In the case at bar, Dougherty's particular type of speech—made as a concerned citizen, purporting to expose the malfeasance of a government official with whom he has no close working relationship—is exactly the type of speech deserving protection under the Pickering and <u>Garcetti</u> rules of decision and our subsequent case law. <u>See, e.g.,</u> <u>Pickering</u>, 391 U.S. at 566, 88 S.Ct. 1731 (protecting speech by teacher to local newspaper criticizing the school board and the superintendent's allocation of school funds); <u>O'Donnell</u>, 875 F.2d at 1060, 1061–63 (protecting speech by chief of police to local television station that accused township supervisors of various corrupt practices, legal improprieties, and abuses of their positions); <u>Watters</u>, 55 F.3d at 897–98 (protecting speech by program manager to local newspaper criticizing departmental program the employee oversaw where dispute existed over cause of disruption) ... Thus, Appellants had fair notice that their retaliation against Dougherty's constitutionally protected speech would not be shielded by qualified immunity."

<u>Id.</u>

Controversial political speech is exactly the type of speech meant to be protected by the First Amendment. <u>McIntyre v. Ohio Elections Comm'n</u>, 514 U. S. 334, 347 (1995) ("[A]dvocacy of a politically controversial viewpoint . . . is the essence of First Amendment expression"); <u>Tinker v. Des Moines Independent Community School Dist.</u>, 393 US 503 (1969). Indeed, the Supreme Court has consistently and repeatedly held that "the First Amendment protects 'even hurtful speech on public issues to ensure that we do not stifle public debate.'" <u>Mahanoy v. Levy</u>, 594 U. S. _____ (2021) (quoting <u>Synder v. Phelps</u>, 562 (U.S. 443, 461 (2011)).

Note that it is not as if a governmental employee's right to speak freely outside work has fallen out of favor. The Supreme Court noted in <u>Mahanoy</u> that far from stifling dissent, schools have an active interest in protecting

> unpopular expression, especially when the expression takes place off

> campus. America's public schools are the nurseries of democracy. Our representative democracy only works if we protect the "marketplace of ideas. This free exchange facilitates an informed public opinion, which, when transmitted to lawmakers, helps produce laws that reflect the People's will. That protection must include the protection of unpopular ideas, for popular ideas have less need for protection.

Mahanoy, supra. Again, this merely restates precedent that has been in place for decades. Looking at Defendants' public statements and conduct, does any observer believe that the left-wing ideologues who control North Penn are interested in protecting expression they disagree with, or are they interested in silencing and chilling it? To read Defendants' motion, claiming authority to fire anyone who privately dissents from their party line, answers that question.

The Mahanoy court also noted that while a school, because it acts in a quasi-parental role, has a hypothetical interest in regulating out-of-school political speech **by a student**, "the school *will [even then] have a heavy burden to justify intervention*" and that its parental role is diminished off campus. Id. However, this rationale only applies to students. There is no, and there has never been, any similar rationale or justification that would allow a school to discipline *an adult employee* based on the content of an adult's *off campus* political speech. Id.

> ii.    **Defendants' Baseless Claim of Disruption Does Not Establish Qualified Immunity, Especially at the Motion to Dismiss Phase**

Defendants' motion attempts to portray Plaintiff's expression as so racially offensive and disruptive that they should be given qualified immunity because it was not clearly established that what they were doing was wrong. This is both factually and legally wrong.

> A.    **Defendants' Motion is Legally Wrong; the Right in Question is whether an Employee has Freedom of Speech Outside Her Job**

The question to be answered is whether it was clearly established in June and July 2020 that a government employee has the right to speak freely on issues of public and social concern

outside of work. See Dougherty, *supra*. Defendants, knowing that they lose that question, have instead tried to recast and reframe the matter. Instead, they claim that there was "no controlling precedent clearly establishing that Bennett's right to post a racially offensive statement about Black Lives Matter on social media outweighed the North Penn School District's right to address the resulting disruption to its goal of promoting the efficiency and effectiveness of its schools." Def. Brief, at p.12.

The egregious factual falsities this statement makes are addressed *infra*. However, notice the bait and switch. Defendants are trying to trying to argue that the constitutional rights of the employee to free speech change depending on the social or political movement being questioned. To be clear, the social and political issues *du jour* that are debated by the citizenry never remain the same; but the rights that protect their ability to freely debate those issues ***do not change***.

Moreover, Defendants ignore that they do not get to fire government employees because they subjectively decide that speech is "racist." The First Amendment exists precisely to protect allegedly controversial speech on allegedly controversial issues. If Defendants were permitted to censor speech because of the subjective labels they applied to it, then any speech could be deemed offensive and illegal at a moment's notice, and the First Amendment would be a dead letter.

The cases that Defendants have cited to support their position bear no resemblance to this case. The first is Sabatini from the District of Nevada. There, a correctional officer made many, many posts directly commenting on inmates he was guarding and, after being asked to remove the posts, he commented directly on his job. He also shared posts which depicted former President Barack Obama with a noose around his neck, and shared an article titled "Michael Brown Memorial – A Memorial to Why Blacks are Ghetto Dwellers." The court thus found that he could

be terminated because his conduct and work related speech were often not on matters of public concern and undermined public confidence in the correctional system.

In <u>Atwater</u> from Georgia, a teacher stated of a black lives matter protest that the signs at the protest should have read: "TAKE THE HOOD OFF YOUR HEAD, AND PULL UP YOUR DANG PANTS, AND QUIT IMPREGNATING EVERYBODY. I'm tired of paying for these sorry *&^ thugs...I would much rather my hard earned money that the government takes go to people who need it, such as abusive [sic] adults and children, not to mention the animals they beat and fight too." The district was 30% black, and there was actual disruption at the school. These statements bear no resemblance to Bennett's speech in this case. There was also no evidence of improper motivation on part of the school's officials, and also no evidence the officials knew that their actions were illegal.

### B. Defendants' Motion is Factually Wrong and Defames Plaintiff

Factually speaking, Defendants' claims that Bennett's post was racist or that disruption was caused are utterly false, and also have to be admitted in favor of Plaintiff at this stage of the case.

**No Disruption** - Defendants' assert that Bennett was disciplined because of "disruption." This is false. **First**, this was not the contemporaneous reason given for the discipline of Plaintiff. Instead, Defendants publicly stated that she was being disciplined because she had contradicted Defendants' preferred political values and opinions. Exhibit 1. The District also 100% endorsed left wing political movement Black Lives Matter. **Second**, an illegal reason (viewpoint discrimination) was a "substantial motivating factor" for the adverse action, even if disruption was also present. Defendants' press release establishes this by itself. **Third**, Defendants have presented no evidence of actual disruption whatsoever, other than that Bennett's political opponents were targeting her.

That Defendants retaliated against Bennett because it agreed with her political opponents is further proof of illegal motives and pretext, and does not establish disruption.

**The Post was Not Racist** - Defendants' assert that Bennett's post was racist, but this is also utterly false and defamatory.[4] The post written by Ashley Bennett expressed informed opinions *shared by millions of black and white Americans*.

The post criticized a controversial political movement, Black Lives Matter, as abandoning and ignoring a large segment of the black population in service of the movement's left wing ideology. Exhibit 2. It noted that because Black Lives Matter is left wing that it does not care about millions of aborted black babies, that it does not stand up for the rights of black conservatives, and that it does not support black law enforcement officers who protect the community. To label the factual content of this post as "racist," when it was defending and supporting a segment of the black population ignored by Black Lives Matter, is mendacious in the extreme. Defendants' supposition that Black Lives Matter cannot be criticized is baseless, as is their assertion that Bennett addressing racial issues is constitutionally inappropriate.

Defendants' pleading claims that Plaintiff can be dismissed because Plaintiff dismissed Black Lives Matter as an expression of hate for President Trump. Setting aside that this is not what the post said, this is again core political speech. Black Lives Matter is not some unique political movement immune from criticism under the US Constitution, and Defendants' are admitting to viewpoint discrimination.

Defendants further claim they can dismiss Ashley Bennett for "denying systemic racism."

---

[4] Plaintiff notes that Defendants do not get to decide what is "racist," and the attack employees on that basis. However, Plaintiff notes that Defendants' are deliberately misconstruing what Bennett posted, and that it was in no way "racist."

Again, setting aside that the post does no such thing (it stated that the DOJ crime statistics do not support a finding of systemic racism by the nation's police forces),[5] Defendants cannot dismiss an educator for expressing a political opinion they dislike. Despite it being baldly illegal, they are literally making an argument that they can fire Bennett based on how offended they are by the content of her opinion.

Defendants vaguely and misleadingly assert, for the purpose of stating that Plaintiff is a racist, that Plaintiff's post "invoked destroyed black babies" and "black on black crime"—but they do not elaborate on why. Bennett references the abortion of black babies in the context of *opposing* the abortion of black babies, and criticizing Black Lives Matter for ignoring this issue. Are defendants contending that opposing the abortion of black children is now grounds for termination? This dishonest argument illustrates the political animosity Defendants' have for Plaintiff.

Defendants' reference to "black on black crime" is similarly false and misleading. Defendants defamatorily imply that Plaintiff invoked black on black crime as an archetypal racist. In fact, she made the reasoned and intelligent observation that Black Lives Matter had nothing to say after a horrendously violent "weekend in Chicago, virtually all black on black violence." Exhibit 2. Bennett made this point in connection with noting that Black Lives Matter says nothing about dead black police officers killed during protests, and burned black businesses. In fact, Bennett was making the opposite point that Defendants' motion claims she was.

Simply because the issue an employee comments upon is race does not allow Defendants

---

[5] Defendants make no attempt to dispute this fact and instead attack her with political rhetoric. The power the Defendants want is breathtaking: the ability to punish and censor employees arbitrarily for out of work speech simply *because the employee "denies" Defendants' political opinions.*

to ignore the First Amendment and rights which the Supreme Court has clearly established for half a century. Given that this is a motion that contends that Defendants have qualified immunity—and there is no dispute at all that viewpoint discrimination is illegal—it is counterproductive in the extreme to Defendants' legal case for them to admit that they terminated her ***because they did not like the content of her opinion***.

### ii. Defendants' Vicious Attacks on Plaintiff Belie their Assertion they Never Disciplined Her

Defendants' briefly assert that no rights of Plaintiff were violated because she was "never disciplined." Def. Brief, at p.12-13. This is an incredible, and false, statement given how Defendants' destroyed her life.

Bennett was told by Mia Kim that she was "suspended" indefinitely without ***any notice or warning*** on June 25, 2020 (which she later found out was done with the intent to terminate). Then, after being assured that everything was going to be kept strictly confidential, Defendants posted ***a public press release*** on June 26, 2020, on the District website slamming her as a racist, and then also gave similar comments to local news media. This press release stated that she had been placed on "administrative leave," a bureaucratic euphemism for suspension. Exhibit 1.

Then, at the end of a Orwellian three-day interrogation where defendant Kim made Bennett justify her political opinions, Kim revealed to Bennett that the decision had already been made to terminate Bennett and that she had to consider who the Board was (i.e., that they are left wing). In other words, her suspension was done with intent to terminate. Kim also outrageously stated that if Bennett contested the termination, she was going to have her career ruined by the Board (showing a predetermined decision) and that she would never work in education again. Kim also discouraged Bennett from raising Loudermill lest it hurt her more. Exhibit 6. The fact

Defendants discouraged Bennett from raising <u>Loudermill</u>, makes it abundantly clear they knew what they were doing was wrong.

When Bennett specifically asked for a second chance, or another option to keep her job, Kim ***said that was not an option.*** Exhibit 6.

Remember, all of this happened without any <u>Loudermill</u> notice being given (and in fact Bennett was discouraged from raising <u>Loudermill</u>), and without any charges being identified that could justify any discipline against Plaintiff.

Defendants also claim that "the letters quoted by Bennett in the Complaint establish that she was provided with the opportunity to hear, and respond to, ***any charges against her.***" Def. Brief, at p.13. Consider how absurd it is that even today, Defendants argue in their brief that Bennett should have appeared to respond to "any charges against her," ***totally unable to actually identify any charges or anything Bennett had legally done wrong***.

Defendants omit is that (1) these letters scheduling an alleged <u>Loudermill</u> hearing were sent ***after*** Bennett had been forced out,[6] and (2) that the letters impermissibly never identified what the charges against Bennett were.

It should be noted that where an employee is threatened with termination and there is no basis for the charges—as is undisputed is the case here—the action against the employee is viewed as "purely coercive." <u>Judge</u>, *supra* (citing <u>Schultz v. United States Navy</u>, 810 F. 2d 1133, 1136 (Fed. Cir. 1987)).

---

[6] Indeed at the Rule 16 conference, after Defendants claimed they had sent Loudermill letters, the Court pointed out they were sent after Bennett was no longer employed.

## V. THERE ARE SPECIFIC ALLEGATIONS AGAINST THE BOARD MEMBERS

Defendants claim that there are no specific allegations against the individual Board Members that they were involved and that therefore the claims against them can be dismissed. This is not accurate.

Individual or personal involvement results in liability to an individual defendant:

> The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F. 3d 865 (2d Cir. 1995).

The section addressing the board members in the Complaint is paragraphs 152-59. There it alleges that the Board Members were well aware of the very public actions being taken against Bennett by the highest levels of North Penn's administration. How could they not be, given that public statements were being issued on the District website? The statement put out by the District is enough by itself to alert the Board that the District was violating Board Policies 320 and 321. See Exhibit 1.

Furthermore, Kim told Bennett during the interrogation sessions that she had consider who the Board was and how the Board would ruin her career if she contested her termination. See Complaint, at p.5, 17; Exhibit 6. This creates the inference that the Board was well aware of what was happening.

Then, when Bennett submitted her letter on July 9, 2020, stating that she had been forced out of the District, *it was also sent to the Board*. <u>See</u> Exhibit 7. Yet, even then, the Board participated in the scheduling of sham <u>Loudermill</u> hearings following Bennett's leaving, and then they all voted to approve Bennett's "resignation" for a false date of July 14, to falsely make it seem as if Bennett had left *after* the fake <u>Loudermill</u> hearings were staged. Complaint, at ¶114-26. In particular, this vote by the Board makes it explicit that they were aware of the illegal course of conduct against Bennett, and ratified it with formal board action.

In short, the Board Members were aware of the illegal conduct toward Bennett, but did nothing. Not only was this ratification, but also grossly negligent supervision. As to participation, it also alleged, which must be accepted as true, that they were intimately involved in deciding that Bennett was to be terminated without even affording her a <u>Loudermill</u> hearing, or notifying what the charges were. They, then of course, participated in the sham approval of Bennett's resignation, demonstrating that they were well aware of what was happening.

At this stage of the case, there is no reason to dismiss these Defendants.

## VI. Conclusion

Plaintiff respectfully requests that the motion be denied. If the Court is inclined to grant any part of the motion, Plaintiff respectfully asks that it be done without prejudice so that Plaintiff can amend to fix any deficiencies.

******

*Respectfully submitted,*
Francis Alexander, LLC

*/s/ AJ Fluehr*
Alfred Fluehr, Esquire

Attorney ID No.:  316503
280 N. Providence Rd. | Suite 1
Media, PA 19063
T:  (215) 341-1063
F:  (215) 500-1005
*Law Firm / Lawyer for Plaintiff*
*/d/ September 17, 2021*

# Certificate of Service

I hereby certify that a true and correct copy of the foregoing Plaintiff's Response in Opposition to Individual Defendants' Motion to Dismiss was filed with the Court via the electronic filing system, and served upon counsel via ECF:

Karl A. Romberger, Jr., Esquire
Sweet Stevens
1 East Butler Avenue,
New Britain, PA 18901
T: (215) 345-9111
F: (215) 348-1147
E: kromberger@sweetstevens.com

*****

*Respectfully submitted,*

Francis Alexander, LLC

*/s/ Francis Malofiy*

Francis Malofiy, Esquire
Attorney ID No.: 208494
Alfred J. Fluehr, Esquire
Attorney ID No.: 316504
280 N. Providence Road | Suite 1
Media, PA 19063
T: (215) 500-1000
F: (215) 500-1005
*Law Firm / Lawyer for Plaintiff*
*/d/ September 17, 2021*